FILED
US DISTRICT COURT
WESTERN DISTRICT
OF ARKANSAS
Apr 15, 2024
OFFICE OF THE CLERK

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Western District of Arkansas

Fort Smith Division

| | |
|---|---|
| In the Matter of the Search of: | ) |
| **A Dark Gray Colored Samsung Cellular** | ) |
| **Phone; A Light Gray Colored Samsung** | )  Case No. 2:24-CM-00020 |
| **Cellular Telephone currently being** | ) |
| **stored at the Drug Enforcement** | ) |
| **Administration's Fort Smith Post of Duty** | ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):* **A Dark Gray Colored Samsung Cellular Phone; A Light Gray Colored Samsung Cellular Telephone currently being stored at the Drug Enforcement Administration's Fort Smith Post of Duty, more particularly described on Attachment A.**

located in the _____ Western _____ District of _____ Arkansas _____ , there is now concealed *(identify the person or describe the property to be seized):* **See Attachment B.**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 846 | Conspiracy to Distribute Controlled Substances |

The application is based on these facts:

- ☑ Continued on the attached sheet. **See affidavit of DEA Task Force Officer Chase Young.**
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Chase Young, DEA Task Force Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____ telephone _____ *(specify reliable electronic means).*

Date: 4/15/24

_____
*Judge's signature*

City and state: Fort Smith, Arkansas

Mark E. Ford, United States Magistrate Judge
*Printed name and title*

## <u>ATTACHMENT A</u>

### TARGET TELEPHONES TO BE SEARCHED

1.     One (1) dark gray colored Samsung cellular telephone, IMEI: unknown, model unknown;

2.     One (1) light gray colored Samsung cellular telephone, IMEI No. 1- 352153372034703, IMEI No. 2- 353024772034701, serial No. R3CX100WZ7K, model unknown.

These cellular telephones described in Attachment A are currently stored at the DEA Fort Smith Post of Duty, in Fort Smith, Arkansas.

Target Telephone #1



Target Telephone #2



## ATTACHMENT B

## ITEMS TO BE SEIZED

Stored electronic records and information tending to establish and document Conspiracy to Distribute Controlled Substances, in violation of Title 21 United States Code 846 including but not limited to:

- Evidence of user attribution showing who used or owned the device at the time the travel, electronically stored communications and data described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved user names and passwords, documents, connections to other cloud storage accounts, and browsing history,

- Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions and specifically all information relating to the Currency located in the Escalade that may indicate its origins in drug trafficking,

- Outgoing, incoming, and missed telephone numbers,

- Numeric/alphanumeric, text, and video/audio messages sent or received,

- Address and telephone number listings,

- Electronically composed memorandum,

- Time and/or data markings to include calendar format organization of all such data,

- Phone book listings to include names, aliases, telephone numbers, codes, types of phone numbers and addresses,

- Photographs and videos which tend to show the owner/user of the cell phones, or which depict controlled substances, money or other assets, or which identify criminal associates,
- Historical GPS locations, and
- Internet web browser history data

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data), messaging content, and any photographic or video form.

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A DARK GRAY COLORED SAMSUNG CELLULAR TELEPHONE; A LIGHT GRAY COLORED SAMSUNG CELLULAR TELPHONE FOUND IN THE POSSESSION OF SHAWKAT N. HAMDI | Case No. _____2:24-cm-00020_____<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Chase Young, being first duly sworn, hereby depose and state as follows:

**PURPOSE OF AFFIDAVIT**

1.    I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 authorizing the examination of a dark gray colored Samsung cellular telephone, IMEI unknown, model unknown (hereinafter, referred to as Target Telephone #1) and a light gray colored Samsung cellular telephone, IMEI No. 1- 352153372034703, IMEI No. 2- 353024772034701, serial No. R3CX100WZ7K, model unknown (hereinafter, referred to as Target Telephone #2), both currently stored at the Drug Enforcement Administration's (DEA) Fort Smith Post of Duty (FSPOD), which is located in the Fort Smith Division of the Western District of Arkansas, more particularly described in Attachment A, and for the extraction from those devices of the electronically stored information described in Attachment B.

2.    Based upon my training and experience and the facts set forth in this affidavit, there is probable cause to believe that the target telephones contain items that constitute evidence, fruits, and instrumentalities in violation of Title 21, United States Code, Section 846, Conspiracy to Distribute controlled substances. There is also probable cause to search the property described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described

in Attachment B. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents. This affidavit is intended to merely show sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

3.    Based upon your affiant's training, experience, shared experience with other agents and officers with whom he has worked, and participation in other investigations involving large amounts of methamphetamine, cocaine, heroin, fentanyl, marijuana and/or other Controlled Substances, your affiant knows the following to be true:

a.    That drug distributors often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates or business entities to avoid detection of these assets by law enforcement authorities;

b.    That even though these assets are in names other than the drug distributors', the drug distributors actually own and continue to use these assets, and exercise dominion and control over them;

c.    That drug distributors often possess large amounts of United States currency in order to maintain and finance their on-going drug business;

d.    That it is common for drug distributors to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them;

e.    That it is common for drug distributors to conceal contraband, proceeds of illegal drug sales, and records of drug transactions in secure locations within their residences, their

businesses, their vehicles, and/or other locations which they maintain dominion and control over for ready access, and to conceal these items from law enforcement authorities;

       f.     That in-order-to accomplish this concealment, drug distributors frequently build "stash" places within their residences, vehicles, or businesses. There are a number of publications available instructing where and how to build "stash" places. Copies of these types of publications have been found in the residences of drug distributors;

       g.     That it is common for persons involved in drug distribution to maintain evidence pertaining to their obtaining, secreting, transfer, concealment, and/or expenditure of narcotics proceeds, such as: currency, financial instruments, precious metals, and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements, and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, and money wrappers. These items are maintained by the drug distributors within their residences, vehicles, businesses or other locations, which they maintain dominion and control over;

       h.     That drug distributors often utilize electronic equipment such as cellular telephones, SIM cards, computers, flash drives, external hard drives, multimedia devices, telex machines, facsimile machines, currency counting machines, and telephone answering machines to generate, transfer, count, record and/or store the information described in items a, b, d, e, and g above, and q and r below;

       i.     That when drug distributors amass large proceeds from the sale of drugs, the drug distributors may attempt to legitimize these profits through various money laundering methods. To accomplish these goals, drug distributors utilize, including but not limited to, domestic and international banks and their attendant services, securities brokers, professionals

such as attorneys and accountants, casinos, real estate, shell corporations, business fronts, and otherwise legitimate businesses which generate large quantities of currency;

j.    That the sale of methamphetamine, cocaine, heroin, fentanyl, marijuana and other Controlled Dangerous Substances generates large quantities of United States currency in small denominations (commonly referred to as "street money");

k.    That it is common for drug distributors to physically handle and count the "street money" after receiving it in exchange for the Controlled Dangerous Substances, thereby leaving residue traces of Controlled Dangerous Substances on the "street money." Law enforcement agencies utilize dogs which are trained to react to the odor of Controlled Dangerous Substances and residue traces of Controlled Dangerous Substances; and that those trained dogs have reacted to narcotics tainted currency negotiated at banks and concealed in the residences of narcotics traffickers;

l.    That it is common for drug distributors to separate their "street money" by denomination and put this currency in rubber banded stacks in varying increments to facilitate quick counting;

m.    That it is recognized, and courts have held, that the small and medium denominations of questionable currency, along with the manner in which the currency is handled, carried and concealed may establish probable cause that there is a substantial connection between the questionable currency and drug transactions, i.e. proceeds of illegal narcotic sales;

n.    That the Currency Transaction Report (CTR) (IRS Form 4789), which is required to be completed and filed with the IRS by all financial institutions on every currency transaction which exceeds $10,000, causes tremendous problems for drug distributors when they attempt to negotiate their illegal profits at financial institutions;

p.      That drug distributors at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other federal, state, or local agencies.  In order to legitimize their spending, these distributors file tax returns reporting income commensurate with the amount of money they have spent during the year, which they feel, can be traced and documented by the government.  The "source" of their income reported on these returns are often falsely stated, misleading or generic in terms.  Retained copies of these returns are commonly kept by the traffickers in their residences and businesses;

q.      That distributors of illegal drugs commonly maintain addresses or telephone numbers in books or papers, or on electronic devices ("ledgers") which reflect names, addresses and/or telephone numbers of their associates in the drug trafficking organization;

r.      That drug distributors take or cause to be taken photographs of themselves, their associates, their property and their product. That these distributors usually maintain these photographs, or electronic versions of them, in their possession, or in their residences and/or vehicles;

s.      That the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances;

t.      That drug distributors commonly have in their possession, that is, on their person, at their residences, in their vehicles, and/or their businesses, property that may include, but is not limited to: illegal drugs, jewelry, vehicles, narcotics paraphernalia, books, records, and United States currency that all may constitute evidence of participation in drug trafficking;

u.      That the target(s) of this and associated investigations are engaged in long-term, continuing criminal activities, namely offenses involving the Title 21, United States Code, Section 846, Conspiracy to Distribute controlled substances.

v.      That the evidence sought through the use of the search warrant listed herein will provide investigators with admissible evidence of these crimes needed to establish the full scope and nature of the offenses being investigated; including determining the identity of members of the organization, the sources of supply, transportation methods, locations used to conceal drugs and the assets purchased from the proceeds derived from the sale of drugs; and,

w.      That there is probable cause to believe that such items of evidence, which represent the fruits and instrumentalities of said offenses and is further described in Attachment B, will be located within the target telephones specified in this application.

4.      Since this affidavit is for the limited purpose of establishing probable cause to support a search warrant, it contains only a summary of facts necessary to establish probable cause. Your affiant has not included each and every fact known to your affiant concerning the entities, individuals, and the events described in this affidavit.

5.      The grounds for issuance of the search warrant are derived from your affiant's review of the physical evidence, discussions with participating agencies, and interviews of persons who have personal knowledge of the events described herein.

**INTRODUCTION AND AGENT BACKGROUND**

6.      Affiant is a Task Force Officer with the United States Department of Justice, Drug Enforcement Administration ("DEA") and has been assigned to the DEA since August 2022. Your affiant is a criminal investigator for the United States within the meaning of Title 21, United States Code, Section 878, and therefore your affiant is empowered to conduct investigations of, and make arrests for, the offenses enumerated in Title 21. Accordingly, your affiant is a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that

is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a seizure warrant.

7.      In addition to your affiant's assignment to the DEA, your affiant has been employed by the Crawford County, Arkansas, Sheriff's Office since 2013. During your affiant's employment with the Crawford County Sheriff's Office, your affiant has been assigned to the DEA Fort Smith Post of Duty as a Task Force Officer (TFO) since August 2022.  Prior to your affiant's assignment as a DEA TFO, your affiant has been assigned to the Crawford County Sheriff's Office Criminal Investigations Division (CID), working drug investigations. Your affiant has receiving training concerning and has been involved in numerous aspects of drug investigations, including, but not limited to, conducting controlled purchases of narcotics; utilizing confidential sources; debriefing defendants, witnesses, and informants; conducting surveillance and undercover operations; preparing and executing search warrants; analyzing documentary and physical evidence, analyzing phone toll records.

8.      In the course of your affiant's career, your affiant has been the affiant of, and/or participated in, numerous search warrants involving the law enforcement seizure of controlled substances, documents associated with the sale of controlled substances and proceeds from the sale of illicit drugs.

9.      Your affiant has personally conducted and/or assisted investigations of criminal violations involving violations of the Federal Controlled Substances Act (Title 21, U.S.C. 841(a)(1) et. seq.).

## **PROBABLE CAUSE**

10.      On March 8, 2024, at approximately 4:27 p.m., while conducting highway patrol on Interstate 40 westbound, Arkansas State Police (ASP) Corporal (Cpl.) Chris Short observed a

black 2023 Cadillac Escalade (Escalade), cross the centerline, into the left lane, almost causing a motor vehicle accident. A nearby vehicle had to utilize its brakes. The driver of the Escalade failed to use a turn signal and immediately swerved back into the right lane. Cpl. Short initiated a traffic stop on the Escalade near mile marker #2 of westbound Interstate 40. The Escalade was bearing license plate number CA/9DDS594 – which was registered on a black 2023 Cadillac Escalade, to Enterprise Rent – A – Car Company, of Los Angeles, CA.

11.    Cpl. Short made contact with the driver who was the only occupant of the vehicle, and noticed the driver was visibly nervous. Cpl. Short observed the driver's hands were trembling when he handed Cpl. Short requested documents. Cpl. Short also could smell the odor of Marijuana coming from inside of the vehicle.

12.    Cpl. Short identified the driver as Shawkat N. HAMDI of Vista, California. When Cpl. Short informed HAMDI of his reason for the traffic stop, HAMDI admitted he was trying to access his map. HAMDI informed Cpl. Short that he delivered dogs. This statement was provided to Cpl. Short without asking for this information. HAMDI agreed to accompany Cpl. Short back to Cpl. Short's patrol vehicle while Cpl. Short checked his driver's license and issued him a warning. Cpl. Short explained to HAMDI that HAMDI was not in trouble. Cpl. Short noticed HAMDI continued to be nervous during the entire traffic stop.

13.    While speaking with HAMDI inside of Cpl. Short's patrol vehicle, Cpl. Short noticed HAMDI's carotid artery pumping in his neck. Cpl. Short also observed that HAMDI was holding his breath and that his abdomen was trembling.  HAMDI explained to Cpl. Short that he delivered dogs from California to Virginia and that he was stopping in Utah to drop off the two (2) dogs he currently had in the vehicle with him. HAMDI explained the company he works for is "Aniops." Cpl. Short noticed that HAMDI was wearing a shirt, a hat, and had a name badge, all

with the name "Aniops" on them. Cpl. Short confirmed the vehicle HAMDI was driving was an Enterprise rental vehicle. Cpl. Short also discovered that HAMDI had an extensive criminal history, later checked by TFO Young and found that HAMDI's criminal history is for numerous drug violations out of California.

14.     Cpl. Short explained to HAMDI that he could smell the odor of Marijuana coming from inside of the vehicle he was driving. Cpl. Short explained he would not give HAMDI a hard time about a little personal use Marijuana. Cpl. Short noticed that HAMDI remained nervous even after Cpl. Short informed him of this. HAMDI then admitted to being nervous and stated he did not know why he was. Cpl. Short explained to HAMDI he was going to search the vehicle HAMDI was driving. HAMDI then asked Cpl. Short if he could retrieve the Marijuana from the vehicle for Cpl. Short. Based on Cpl. Short's training and experiences, he knows this type of statement is usually indicative of additional contraband inside of the vehicle.

15.     Cpl. Short then conducted a probable cause search of HAMDI's vehicle. During this search, Cpl. Short discovered a small amount of Marijuana wrapped in a brown piece of plastic and a white package labeled Gelato, which appeared to be a brand name of Marijuana. (later discovered to have a total weigh of approximately eight (8) grams), found in the center console of this vehicle.

16.     Cpl. Short also located a large amount of U.S. Currency inside of a taped carboard box, found in the second row of this vehicle and underneath a blanket. Cpl. Short located another large amount of U.S. Currency inside of a black trash bag concealed within a black Pelican – style box, found in the second row of this vehicle underneath a blanket. Cpl. Short also located an additional amount of small undetermined amount in U.S. Currency, found in the center console of this vehicle. Cpl. Short also located and seized several miscellaneous receipts. Det. Brian Stanley,

a member of the drug task force, located Target Telephone #1with tape on it, found in the center console area of the Escalade, and Target Telephone #2, found on HAMDI's person. Det. Stanley seized a Cobra in–car dash camera, located inside the Escalade.

17.    HAMDI was placed under arrest for possession of marijuana and criminal use of property and/or laundering proceeds. HAMDI was later transported to the 12/21st Joint Drug Task Force (12/21st JDTF) Office. While at the 12/21st JDTF Office, HAMDI informed Det. Stanley that he (HAMDI) told the trooper that stopped him, "You're about to be a legend." While Det. Stanley was standing near HAMDI, a Trooper carried in the cardboard box (containing the U.S. Currency), and placed the cardboard box on a nearby table, Det. Stanley overheard HAMDI state, "I bet it takes two of them to carry the other box, that fucker is heavy." Det. Stanley watched as troopers entered the 12/21st JDTF Office carrying the Pelican-style case, and asked HAMDI how much money was in the box. HAMDI replied, "I don't know, I've never actually looked at it. I was told not to, but it's a lot." Det. Stanley stated that HAMDI later asked law enforcement if he could look at the U.S. Currency before he went to jail. HAMDI was then transported to the Crawford County Detention Center.

18.    Det. Stanley and Det. Cody Elliot met with HAMDI and HAMDI requested the assistance of counsel. On March 8th, Special Agent Mike Brooks with DEA, Fort Smith Post of Duty (FSPOD) was contacted by Det. Elliot of the 12/21st JDTF. Det. Elliot informed SA Brooks of the facts surrounding the incident. SA Brooks immediately began conducting inquires of HAMDI, via investigative databases available to him. After conducting several investigative checks of HAMDI, coupled with information learned from the motor vehicle stop, SA Brooks determined that HAMDI had significant connections to known drug offenders who are the target (s) of other DEA investigations. Specifically, SA Brooks spoke with another DEA Agent who

confirmed HAMDI is an associate of a known Fentanyl trafficker based in southern California. Per that ongoing investigation, SA Brooks noted that HAMDI has been identified as a co-conspirator in the drug trafficking investigation.

19.     On March 11, 2024, Cpl. Short and Det. Elliott retrieved the U.S. Currency from the ASP Troop H, secure evidence room where it had been stored since March 8, 2024 though stored inside an unrelated suitcase and sealed with evidence tape for temporary storage. The Pelican-style case and the cardboard box was stored at the 12/21st JDTF office.  The Currency and packaging was transported to the JDTF Office in Van Buren, Arkansas. On March 11, 2024, Greenwood, Arkansas, Police Department (GPD) K-9 Officer, Trent Cowan presented his K-9 partner to the now empty cardboard and Pelican-style boxes for an open-air sniff.  According to K-9 Officer Cowan, during this presentation, his K-9 partner provided a positive alert to the odor of an illegal narcotic(s) coming from the cardboard and Pelican-style boxes.

20.     On March 11, 2024, SA Brooks and SA Chronister arrived at the JDTF Office and met with Cpl. Short, Det. Stanley, and Det. Elliott. SA Brooks and SA Chronister took custody of the U.S. Currency and processed it into SSEE bags. SA Brooks and SA Chronister took custody of Target Telephones #1 and #2. The U.S. Currency was later counted during an official count at the Arvest Bank in Fort Smith, Arkansas, resulting in amounts of $810,490.00 and $3,000.00.

21.     Based on the above large amount of currency HAMDI was transporting, the statements of HAMDI indicating he did not know the amount and was told not to look in the boxes, and HAMDI's connection to a known drug trafficking organization, I believe there is probable cause to believe there is evidence contained upon the target devices. Specifically, there is probable cause to believe that the target devices will contain contacts and communication with other co-conspirators.

**PHONES TO BE SEARCHED**

22.     In my training and experience, I am aware that traffickers of illegal narcotics frequently utilize cellular telephones to facilitate the purchase, transportation, and/or distribution of illegal narcotics.  Specifically, your affiant is aware the drug traffickers utilize multiple cellular telephones to communicate with co-conspirators during the transport of illegal narcotics to avoid detection and to differentiate between types of transactions, end-user and sources of supply. Furthermore, cellular telephones frequently contain names, text messages, voice mail messages, photographs, videos, and contact numbers for/of others involved in the distribution of illegal narcotics.

23.     Further, in my training and experience, a conspiracy to traffic narcotics generates various types of cellular telephone-related evidence.  For example, the following types of evidence may be generated during the conspiracy: (1) telephone and direct contact numbers; (2) identifying information assigned to the device (including usernames, passwords and e-mail addresses); (3) call detail information (outgoing/incoming/missed calls); (4) internet protocol addresses accessed by the device or accessing the device; (5) stored photographs, videos and text messages; (6) stored electronic mail, including attachments, and voice messages and other recordings; (7) web browsing history and any stored web pages; (8) stored documents and other files; (9) stored geo-location information; and (10) data stored in any application.

24.     Based upon your affiant's training and experience, your affiant also knows that members of drug trafficking organizations, including dealers, often use mobile phones to communicate with their narcotics source of supply and delivery recipients. Drug distributors often use SMS text messaging to communicate arrival and departure times, meeting places, details about narcotics, and details about other co-conspirators involved in the distribution of narcotics. Your

affiant has also observed drug distributors who photograph large sums of U.S. Currency and/or narcotics, which are then stored on the mobile device.

25.     Your affiant also knows that while drug transactions take place across the nation, and in a variety of forms, drug proceeds, in large quantities, are commonly transported back to border or source states within the U.S. This is normally seen on our interstates as travel westbound or southbound; whereas, drug distribution and trafficking is normally seen on our interstates as travel eastbound or northbound. Your affiant also knows that those involved in drug trafficking and illicit bulk-currency movement. Lastly, your affiant knows that those involved in drug trafficking activities often carry more than one cellular telephone. This technique is conducted so that these individuals can dedicate one phone for personal communications, and one phone for from illicit activity communications. Your Affiant has experience in investigations where individuals involved with drug trafficking dedicate one phone for their drug sources of supply and one phone for their drug customers.

26.     Based upon your affiant's training and experience, your affiant's review of documents and other relevant information your affiant believes to be reliable, discussions with other law enforcement officers and the facts supporting probable cause set as forth herein, your Affiant believes that evidence of the violation of Title 21, United States Code, Section 846, Conspiracy to Distribute controlled substances, as described in Attachment B, is presently located on or within the Target Telephones #1 and #2, more particularly described in Attachment A.

## TECHNICAL TERMS

27.     Based on your affiant's training and experience, your affiant uses the following technical terms to convey the following meanings:

a.      Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.      Based on your affiant's training, experience, your affiant knows that the devices have capabilities that allow it to serve as a wireless telephone. Your affiant also knows the devices would allow to store text messages and digital images of, or related to, narcotics possession or distribution.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

28.     Based on your affiant's knowledge, training, and experience, your affiant knows that electronic devices can store information for long periods of time.

29.     Forensic evidence. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described in the warrant, but also forensic evidence that establishes how the device

was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the device because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence in analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

b.      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic device was used, the purpose of their use, who used them, and when.

c.      The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a wireless telephone is evidence may depend on other information stored on the wireless telephone and the application of knowledge about how a wireless telephone operates. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

d.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on storage medium.

30.    Nature of examination. Based on the foregoing, and consistent with Federal Rule of Criminal Procedure 41(e)(2)(B), the warrant your affiant is applying for would permit the examination of the device consistent with this warrant. The examination may require authorities

to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

31.    Manner of execution.  Because this warrant seeks only permission to examine a device that is already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise.  Consequently, your affiant submits there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

32.    Based on the above information, your affiant has reason to believe that concealed within Target Telephone #1, and Target Telephone #2, which is further described in Attachment A, are items that constitute evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Section 846, Conspiracy to Distribute controlled substances.  Your Affiant further believes that a search of these target telephones will result in the discovery of items that constitute evidence, fruits, and instrumentalities of these activities, specifically, the items listed in Attachment B.

Further your Affiant sayeth not.

Respectfully submitted,

CHASE YOUNG          Digitally signed by CHASE
(Affiliate)                    YOUNG (Affiliate)
                              Date: 2024.04.18 10:57:10 -05'00'

Chase Young
DEA, Task Force Officer

Subscribed and sworn to before me on April *15*, 2024

HONORABLE MARK E. FORD
CHIEF UNITED STATES MAGISTRATE JUDGE